# EXHIBIT B

No. 18-459

# In the Supreme Court of the United States

EMULEX CORPORATION, ET AL., PETITIONERS

*v.*

GARY VARJABEDIAN, ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

**BRIEF FOR THE RESPONDENTS**

JUAN E. MONTEVERDE
MILES D. SCHREINER
MONTEVERDE & ASSOCIATES PC
The Empire State Building
350 Fifth Ave., Ste. 4405
New York, NY  10118

BENJAMIN HEIKALI
FARUQI & FARUQI LLP
10866 Wilshire Blvd., Ste. 1470
Los Angeles, CA  90024

DANIEL L. GEYSER
    *Counsel of Record*
GEYSER P.C.
One Energy Square
4925 Greenville Ave., Ste. 200
Dallas, TX  75206
(214) 800-2660
*daniel.geyser@geyserpc.com*

## QUESTION PRESENTED

Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. 78n(e), sets out two distinct forms of liability "in connection with any tender offer." Its first clause makes it "unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Its second clause makes it "unlawful for any person * * * to engage in any fraudulent, deceptive, or manipulative acts or practices."

Consistent with its plain text, this Court has twice construed language indistinguishable from the first clause to require a showing of negligence, not scienter. This Court has also confirmed that where, as here, a statute separates two clauses with the disjunctive (declaring it "unlawful" to violate the first clause "or" the second), each clause retains its own distinct culpability requirement.

The question presented is:

Whether an action premised solely on Section 14(e)'s first clause, not its second, requires pleading scienter to state a claim.

The question *not* presented is:

Whether Section 14(e) creates a private right of action, a splitless question that was not pressed or passed upon below because petitioners conceded the issue (consistent with the uniform holding of every appellate court to have considered the question for the past fifty years).

(I)

II

## PARTIES TO THE PROCEEDING BELOW

Petitioners are Emulex Corporation; Bruce C. Edwards; Jeffrey W. Benck; Gregory S. Clark; Gary J. Daichendt; Paul F. Folino; Beatriz V. Infante; John A. Kelley; Rahul N. Merchant; Nersi Nazari; Dean A. Yoost; Avago Technologies Wireless (USA) Manufacturing, Inc.; and Emerald Merger Sub, Inc.

Respondents are Gary Varjabedian and Jerry Mutza. Mr. Varjabedian filed the initial complaint in this case, but the district court ultimately appointed Mr. Mutza as lead plaintiff for the class. See Pet. App. 1a n.1.

III

## TABLE OF CONTENTS

Page

Opinions below ...........................................................1

Jurisdiction ................................................................1

Statement...................................................................2

Summary of argument ..............................................5

Argument...................................................................9

I.  The first clause of Section 14(e) requires a showing of negligence, not scienter, to state a claim........................................................9

   A.  The section's plain text and context establish that scienter is not required ....................9

   B.  The section's purpose and history confirm that scienter is not required ....................19

   C.  Petitioners are incorrect that courts are required to construe all private rights of action in favor of avoiding liability...................................................................25

II.  Petitioners' challenge to Section 14(e)'s private right of action is both meritless and not properly before the court........................................26

   A.  Petitioners waived the challenge by expressly conceding the issue below.....................26

   B.  Section 14(e) creates a private right of action.........................................................28

      1.  Congress adopted the verbatim formulation of Rule 10b-5, which gives rise to private remedies.........................29

      2.  Congress enacted Section 14(e) to mirror the existing treatment of Section 14(a), which gives rise to private remedies...............................................34

IV

3.  Courts have uniformly held that a private right exists for the past 50 years, and Congress has made no attempt to disturb this settled practice ............................................................... 38

4.  Petitioners and the government have failed to cast any genuine doubt on this settled regime ........................... 43

Conclusion ............................................................................... 46

## TABLE OF AUTHORITIES

Cases:

*Aaron* v. *SEC*, 446 U.S. 680 (1980) ............................. *passim*
*Adams* v. *Standard Knitting Mills, Inc.*, 623 F.2d 422
    (6th Cir. 1980) ...................................................................... 19
*Alexander* v. *Sandoval*, 532 U.S. 275 (2001) .............. *passim*
*Bath Indus., Inc.* v. *Blot*, 427 F.2d 97 (7th Cir. 1970) ....... 36
*Caleb & Co.* v. *E.I. Du Pont de Nemours & Co.*,
    615 F. Supp. 96 (S.D.N.Y. 1985) ...................................... 41
*Cannon* v. *Univ. of Chicago*, 441 U.S. 677 (1979) ..... *passim*
*Casey's Gen. Stores, Inc.* v. *Alimentation
    Couche-Tard, Inc.*, No. 4:10-cv-00265, 2010
    U.S. Dist. LEXIS 101129 (S.D. Iowa Sep. 8, 2010) ...... 38
*Central Bank of Denver, N.A.* v. *First Interstate
    Bank of Denver, N.A.*, 511 U.S. 164 (1994) ............. 25, 40
*Chaidez* v. *United States*, 568 U.S. 342 (2010) ................... 26
*Continental Airlines, Inc., In re*, 932 F.2d 282
    (3d Cir. 1991) ...................................................................... 15
*Cutter* v. *Wilkinson*, 544 U.S. 709 (2005) ........................... 28
*DeKalb Cty. Pension Fund* v. *Transocean Ltd.*,
    817 F.3d 393 (2d Cir. 2016) .............................................. 19
*Digital Island Sec. Litig., In re*, 357 F.3d 322
    (3d Cir. 2004) ...................................................................... 40
*Electronic Specialty Co.* v. *Int'l Controls Corp.*,
    409 F.2d 937 (2d Cir. 1969) .............................................. 41

V

Page

Cases—continued:

*Ernst & Ernst* v. *Hochfelder*,
425 U.S. 185 (1976)....................................................*passim*
*Feldbaum* v. *Avon Prods., Inc.*, 741 F.2d 234
(8th Cir. 1984).....................................................40
*Flaherty & Crumrine Preferred Income Fund, Inc.*,
565 F.3d 200 (5th Cir. 2009).....................................40
*Garcia* v. *United States*, 469 U.S. 70 (1984) .......................16
*Gas Nat.* v. *E.ON AG*, 468 F. Supp. 2d 595
(S.D.N.Y. 2006).................................................38
*Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F.2d 1281
(2d Cir. 1973) ...............................................20, 21
*Glover* v. *United States*, 531 U.S. 198 (2001)......................28
*H. K. Porter Co.* v. *Nicholson File Co.*, 482 F.2d 421
(1st Cir. 1973) ..................................................18
*Henson* v. *Santander Consumer USA Inc.*,
137 S. Ct. 1718 (2017) .........................................9
*Herman & MacLean* v. *Huddleston*,
459 U.S. 375 (1983)........................................18, 31, 45
*Indiana Nat'l Corp.* v. *Rich*, 712 F.2d 1180, 1183
(7th Cir. 1983)...............................................31, 41
*J.I. Case Co.* v. *Borak*, 377 U.S. 426 (1964)................*passim*
*Johnson* v. *Interstate Mgmt. Co.*, 849 F.3d 1093
(D.C. Cir. 2017)................................................44
*Lane* v. *United States*, 286 F.3d 723 (4th Cir. 2002) .........15
*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011).............................................23
*McFarland* v. *Wells Fargo Bank, N.A.*, 810 F.3d 273
(4th Cir. 2016)................................................14
*Piper* v. *Chris-Craft Indus., Inc.*,
430 U.S. 1 (1977)......................................*passim*
*Pryor* v. *U.S. Steel Corp.*, 591 F. Supp. 942
(S.D.N.Y. 1984)................................................13
*Schreiber* v. *Burlington N., Inc.*,
472 U.S. 1 (1985)..........................................10, 20, 39

VI

Page

Cases—continued:

*SEC* v. *Texas Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968) .......................................20, 21

*Smallwood* v. *Pearl Brewing Co.*, 489 F.2d 579
(5th Cir. 1974)....................................................................39

*Stevens* v. *Employer-Teamsters Joint Council No. 84
Pension Fund*, 979 F.2d 444 (6th Cir. 1992) .................14

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta,
Inc.*, 552 U.S. 148 (2008)..................................................43

*Stull* v. *Bayard*, 561 F.2d 429 (2d Cir. 1977) ......................40

*Susquehanna Corp.* v. *Pan Am. Sulphur Co.*,
423 F.2d 1075 (5th Cir. 1970)...........................................41

*Taro Pharm. Indus.* v. *Sun Pharm. Indus.*, 2010 U.S.
Dist. LEXIS 84163 (S.D.N.Y. July 13, 2010) ................38

*Taylor* v. *Freeland & Kronz*, 503 U.S. 638 (1992) .............26

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................23

*Touche Ross & Co.* v. *Redington*,
442 U.S. 560 (1979)...................................................*passim*

*Transamerica Mortg. Advisors, Inc.* v. *Lewis*,
444 U.S. 11 (1979)..............................................................35

*TSC Indus., Inc.* v. *Northway, Inc.*,
426 U.S. 438 (1976)............................................................23

*United States* v. *Dunkel*, 927 F.2d 955
(7th Cir. 1991)....................................................................27

*United States* v. *Naftalin*, 441 U.S. 768 (1979)............14, 15

*United States* v. *O'Hagan*, 521 U.S. 642 (1997) .................20

*United States* v. *Sheldon*, 755 F.3d 1047
(9th Cir. 2014).....................................................................14

*United States* v. *United Foods, Inc.*,
533 U.S. 405 (2001).............................................................26

*Virginia Bankshares, Inc.* v. *Sandberg*,
501 U.S. 1083 (1991).........................................................25

*Walgreen Co. Shareholder Litig., In re*,
832 F.3d 718 (7th Cir. 2016)............................................24

*Yates* v. *United States*, 135 S. Ct. 1074 (2015)...................16

VII

Page

Cases—continued:

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) ................... 28
*Youakim* v. *Miller*, 425 U.S. 231 (1976) ............................ 28

Statutes, regulations, and rules:

Act of Dec. 22, 1970, Pub. L. No. 91-567, § 5,
    84 Stat. 1497-1498 ............................................... 41
Insider Trading and Securities Fraud Enforcement Act,
    Pub. L. No. 100-704, 102 Stat. 4680 ............................... 41
Private Securities Litigation Reform Act of 1995
    (PSLRA), Pub. L. No. 104-67, 109 Stat. 737 ........... 22, 42
Pub. L. No. 104-67, § 203, 109 Stat. 762 .............................. 43
Securities Act of 1933,
    Pub. L. No. 73-22, 48 Stat. 74 ................................. *passim*
    15 U.S.C. 77q(a) (§ 17(a)) ....................................... *passim*
    15 U.S.C. 77q(a) (§ 17(a)(1)) ........................................ 11
    15 U.S.C. 77q(a) (§ 17(a)(2)) ................................. *passim*
Securities Exchange Act of 1934,
    Pub. L. No. 73-291, 48 Stat. 881 ............................. *passim*
    15 U.S.C. 78j(b) (§ 10(b)) ....................................... *passim*
    15 U.S.C. 78n(d)(4) (§ 14(d)(4)) ..................................... 17
    15 U.S.C. 78n(e) (§ 14(e)) ...................................... *passim*
    15 U.S.C. 78t-1(a) ............................................... 41
    15 U.S.C. 78t-1(d) ............................................... 41
    15 U.S.C. 78u-4(b) ......................................... 18, 22, 24, 42
    15 U.S.C. 78u-4(b)(1)(A) .......................................... 22
    15 U.S.C. 78u-4(b)(1)(B) .......................................... 22
    15 U.S.C. 78u-4(b)(2)(A) .......................................... 22
    15 U.S.C. 78u-4(c) ............................................... 24
    15 U.S.C. 78u-5(b)(2)(C) .......................................... 42
    15 U.S.C. 78u-5(c)(1) ............................................ 42
28 U.S.C. 1254(1) ...................................................... 1
17 C.F.R. 240.10b-5 (Rule 10b-5) ............................... *passim*
17 C.F.R. 240.14a (Rule 14a-9) ................................. *passim*

VIII

Page

Rules—continued:

Sup. Ct. R. 14.1(a) ...............................................27
Fed. R. Civ. P. 11................................................24

Miscellaneous:

113 Cong. Rec. 24,664 ..........................................36
113 Cong. Rec. 24,665 (1967) ...............................31
L. Bebchuk, et al., *Fairness Opinions: How Fair Are
    They and What Can Be Done About It?*, 1989 Duke
    L.J. 27 (Feb. 1989) .........................................22
H.R. Rep. No. 1711, 90th Cong., 2d Sess. (1968) .........20, 37
H.R. Rep. No. 910, 100th Cong., 2d Sess. (1988) ..............42
Ann Lipton, *The Puzzle of Emulex*, Business Law Prof
    Blog (Jan. 12, 2019) <tinyurl.com/securities-expert-on-
    emulex> ......................................................37, 38
3 L. Loss, *Securities Regulation* (2d ed. 1961)..................10
L. Loss, et al., *Fundamentals of Securities Regulation*
    (5th ed. 2004) .................................................11
*Senate Comm. on Banking and Currency: Hearings
    Before the Subcomm. on Securities on S. 510*, 90th
    Cong., 1st Sess. (1967).....................................36

# In the Supreme Court of the United States

---

No. 18-459

EMULEX CORPORATION, ET AL., PETITIONERS

*v.*

GARY VARJABEDIAN, ET AL.

---

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

---

**BRIEF FOR THE RESPONDENTS**

---

## OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-26a) is reported at 888 F.3d 399. The order and opinion of the district court (Pet. App. 27a-57a) is reported at 152 F. Supp. 3d 1226.

## JURISDICTION

The judgment of the court of appeals was entered on April 20, 2018. A petition for rehearing was denied on September 6, 2018 (Pet. App. 58a-59a). The petition for a writ of certiorari was filed on October 11, 2018, and granted on January 4, 2019. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

2

## STATEMENT

1. This action arises from a merger between Emulex Corporation and Avago Technologies. The companies announced their merger agreement in February 2015, with "Avago offering to pay $8.00 for every share of outstanding Emulex stock." Pet. App. 2a-3a. That price reflected a 26.4% premium over the previous closing price, and a 4.8% premium over Emulex's 52-week high. J.A. 77-78; see also Pet. App. 39a.

Emulex hired Goldman Sachs to perform a fairness analysis on the proposed deal. As part of its work, Goldman Sachs conducted a premium analysis—a study of 17 comparable transactions that Goldman Sachs "deemed most similar to the proposed merger." Pet. App. 4a-5a. That analysis revealed Emulex's premium was decidedly below average: other companies received mean and medium premiums of (i) 44.8% and 50.8% over their undisturbed stock price, and (ii) 17.6% and 14.4% over their 52-week highs. J.A. 255. Those figures represented *multiples* of the premium offered to Emulex's shareholders. Goldman Sachs nonetheless concluded the merger was fair "despite a below-average premium." Pet. App. 5a.

Emulex filed a 48-page Recommendation Statement with the SEC supporting Avago's offer and encouraging shareholders to tender their shares. Pet. App. 3a-4a; J.A. 21. It listed nine reasons for that recommendation, including (repeatedly) that "Emulex shareholders would receive a premium on their stock." Pet. App. 4a. Despite devoting five single-spaced pages to summarizing Goldman Sachs's fairness opinion, Emulex neglected to disclose the premium analysis (or its showing of a below-average premium) at any point in its extended filing. *Id.* at 5a, 30a.

The merger was ultimately consummated, but the approval was close: only 60.58% of outstanding shares were tendered. J.A. 179.

3

2. In response to these events, a shareholder class filed suit against Emulex, its board, and Avago for violating federal securities laws. Pet. App. 5a-6a. As relevant here, the class sought relief under Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. 78n(e), which was added as part of the Williams Act of 1968, Pub. L. No. 90-439, 92 Stat. 454.

Section 14(e) sets out two distinct types of liability in the tender context. Its first clause prohibits "any untrue statement of a material fact or [a material] omi[ssion]," and its second clause prohibits "any fraudulent, deceptive, or manipulative acts or practices." 15 U.S.C. 78n(e). The class alleged a violation of the first clause: petitioners made material misstatements and omissions by touting the premium while failing to "disclose[]" it "was below average." Pet. App. 5a.

3. The district court dismissed the complaint. Pet. App. 27a-57a. It held that scienter was required to prove a Section 14(e) violation, and it found the class failed to adequately allege scienter. *Id.* at 33a-51a. In the course of its analysis, the court acknowledged respondents' position that scienter was not required, and recognized that scholars and treatises read Section 14(e)'s first clause as imposing only a negligence standard. *Id.* at 35a-36a. While the court admitted respondents' position was "not entirely without merit," it decided the "better view" was to follow "the wealth of persuasive case law to the contrary." *Id.* at 36a.[1]

4. a. The court of appeals reversed. Pet. App. 1a-26a. As relevant here, the court held that claims premised on

---

[1] Because the district court dismissed the complaint on culpability grounds, it declined to decide whether respondents had adequately pleaded materiality. See Pet. App. 34a n.3. But it did acknowledge that "[n]o doubt some investors would have found the Premium Analysis interesting and useful." *Id.* at 46a.

4

Section 14(e)'s first clause "require[] a showing of negligence, not scienter." *Id.* at 2a. Because respondents' claims were premised solely on that first clause, the court found the district court erred by requiring a showing of intentional misconduct. *Id.* at 20a.

The Ninth Circuit started its analysis with the text. Pet. App. 8a. It noted that a "plain reading" of Section 14(e) "divides the section into two clauses, each proscribing different conduct." *Ibid.* It found that the "text of the first clause" is "devoid of any suggestion that scienter is required." *Id.* at 16a. It explained that this Court had construed "largely identical" text to "require[] a showing of negligence, not scienter." *Id.* at 13a (discussing *Aaron* v. *SEC*, 446 U.S. 680 (1980), and *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976)). And the court reinforced its conclusion with Section 14(e)'s "legislative history and purpose"—which "place[] more emphasis on the quality of information shareholders receive in a tender offer than on the [issuer's] state of mind." *Id.* at 15a-16a.

While recognizing that other courts had suggested scienter is required, the Ninth Circuit exhaustively refuted their logic, especially their presumption that the same rules apply to both Rule 10b-5 (which requires scienter) and Section 14(e)'s first clause (which does not). Pet. App. 9a-16a. As the Ninth Circuit explained, those courts overlooked "important distinctions" between the two provisions, and likewise ignored (or preceded) this Court's pertinent authority. *Id.* at 9a, 14a-15a. The court explained, for example, that *Ernst*'s conclusion to require scienter under Rule 10b-5 "had nothing to do with [its] text," but instead resulted from the Rule's "relationship" with "its authorizing legislation, Section 10(b)," which textually *did* require scienter. *Id.* at 11a-12a (further noting that "[t]his rationale regarding Rule 10b-5 does not apply to Section

5

14(e), which is a statute, not an SEC Rule"). And it explained that other decisions preceded *Aaron*, which construed Section 17(a)(2)'s parallel language to "*not* require a showing of scienter"—thus "cast[ing] doubt" on earlier Section 14(e) decisions from multiple circuits. *Id.* at 12a.

b. Judge Christen concurred in "full[]." Pet. App. 20a. She emphasized that the panel's decision "is a faithful application" of this Court's decisions, unlike other courts that failed to "address[] the ramifications of the Supreme Court's holdings." *Id.* at 20a-26a. Under the Act's plain text, she explained, "[o]nly the second clause of § 14(e) contemplates a scienter requirement; Congress did not use the words signaling a heightened standard of culpability in the first clause of the statute." *Id.* at 24a.

Judge Christen concluded that one "cannot be sure how other circuits would rule were they to revisit § 14(e) in light of *Ernst & Ernst* and *Aaron*." Pet. App. 26a.

5. Petitioners subsequently sought rehearing on Section 14(e)'s culpability requirement. As before the panel, they did not ask the full court to reconsider its authority declaring Section 14(e) privately enforceable, and they did not argue (or even reference) any of this Court's "modern" private-rights-of-action cases. C.A. Emulex Reh'g Pet. 1-18.

The court of appeals denied the petition without recorded dissent. Pet. App. 58a-59a.

**SUMMARY OF ARGUMENT**

Congress enacted Section 14(e) to create a private right of action premised on negligence, not scienter. The Ninth Circuit's holding below was correct, and the judgment should be affirmed.

I. A. The Ninth Circuit correctly read Section 14(e)'s plain language to mean what it says. Its two clauses are

6

set up as separate, independent bans on distinct wrongdoing. The first clause—prohibiting material misstatements and omissions—has nothing to do with scienter. Indeed, a scienter requirement does not expressly appear *anywhere* in Section 14(e), and only its second clause even uses words traditionally associated with scienter ("fraudulent, deceptive, and manipulative"). This Court has *twice* construed materially identical text as requiring mere negligence, not scienter. There is no reason to give the same language a different meaning here.

B. Petitioners' theory would undermine Congress's objectives. The entire point of the Williams Act was to ensure shareholders receive full and fair disclosures. A shareholder suffers the same prejudice whether a disclosure was negligent or intentional, and there is no indication Congress intended to give corporate actors a free pass for unreasonably failing to disclosure *material* information. The tender-offer rules impose duties on those same actors to ensure they deliver what Congress has deemed necessary for informed shareholder voting. If a defendant fails to honor its obligations, it has frustrated the statutory objective.

Petitioners also predict a rash of reckless securities litigation, but their concerns are unfounded. Securities claims are difficult to prove. There are few cases that can satisfy every other heightened element, but would still lose on scienter alone. And if there are any legitimate concerns about abusive litigation, the answer is to *target the abuse*, not to artificially distort the natural elements of Section 14(e). Congress has fashioned a series of adequate remedies calibrated specifically for the securities context; courts can employ those remedies without grafting an atextual scienter requirement onto every private right of action.

7

C. Petitioners are mistaken that courts are required to construe every private right of action to assume the smallest possible footprint. The analysis in this context, like the analysis of any other statutory provision, is tethered directly to Congress's intent. There is no rule of law or logic permitting courts to abandon all the usual tools of statutory construction in the implied-right-of-action context. And employing those tools here, it is clear that Section 14(e) is satisfied without a showing of scienter.

II. A. In this Court, but not below, petitioners now argue that Section 14(e) does not create a private right of action. That question was not pressed or passed upon below; on the contrary, petitioners expressly *conceded* that Section 14(e) *does* support a private right of action. The fact that petitioners broadly framed their question presented does not automatically revive an argument petitioners indisputably waived before the Ninth Circuit.

Nor is the case suitably presented for review. The appellate courts are unanimous in finding that Section 14(e) provides a right of action; the arguments in the parties' briefs have not been carefully vetted by any court below, and it makes little sense for this Court to be the very first to grapple with these (occasionally) thorny issues.

And there is a compelling practical benefit to further percolation. The Section 14(e) right of action has been a fixture in the lower courts for half a century. Congress has had every opportunity to repudiate the uniform consensus that a private right exists, but it has instead said nothing—aside from effectively ratifying the unbroken line of decisions. There is a serious danger that jumping on the issue at this late hour will upset, not uphold, Congress's intent, and interfere with the considered judgment of the political branches. A short pause would put Congress on notice that the issue ought to be on its radar.

8

B. In any event, petitioners' private-right challenge is insubstantial on the merits. At its irreducible core, this issue turns on legislative intent, and there is no doubt that Congress understood it was activating a private right of action.

1. Congress, first and foremost, "modeled" Section 14(e) after the specific language of Rule 10b-5, which was widely known to create private rights. When Congress invoked the same textual formulation, it quite clearly intended the same result.

2. Congress's express purpose in the Williams Act was to impose the same regulatory scheme for proxy solicitations (under Section 14(a)) and tender offers (under the new Section 14(e)). Four years before Congress acted, this Court declared that Section 14(a) created a private right of action. This Court's decision was called to Congress's attention during the legislative process, and there is no reason to think Congress tried to "harmonize" these two schemes by inserting a sharp break between their central means of enforcement. Neither petitioners nor the government could explain why Congress would conceivably wish to let private parties seek relief for false statements in a proxy solicitation but not in a tender offer. There is no reason to inject a puzzling anomaly into the statutory scheme.

3. For the past 50 years, every single circuit to have confronted the question has determined that Section 14(e) is privately enforceable. Indeed, this Court itself has adjudicated a private claim under Section 14(e), without so much as a hint that the private action did not exist.

Congress has now acted against this clear consensus for half a century, and it has repeatedly revised the securities laws, including in areas that directly touch the tender context. It is inconceivable that Congress disagreed with this overwhelming judicial authority but simply said

9

nothing about it. If the Court nonetheless thinks this issue has any possible merit, it should at least await a vehicle where the petitioners did not outright waive the question below.

The Ninth Circuit faithfully read Section 14(e)'s plain text consistent with this Court's unmistakable guidance, and its decision alone is consistent with the statutory scheme. The judgment should be affirmed.

## ARGUMENT

## I. THE FIRST CLAUSE OF SECTION 14(e) RE-QUIRES A SHOWING OF NEGLIGENCE, NOT SCIENTER, TO STATE A CLAIM

### A. The Section's Plain Text And Context Establish That Scienter Is Not Required

1. Statutory interpretation starts with the text (*e.g.*, *Henson* v. *Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017)), and the text here is unambiguous. Section 14(e) is plainly divided into two clauses, each targeting a different category of prohibited conduct:

It shall be unlawful for any person [1] to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or [2] to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer * * * .

15 U.S.C. 77n(e) (brackets added).

The first clause has no hint of scienter. It does not expressly require scienter (or *any* specific state of mind). It does not use any of the usual terms associated with scienter (*Aaron*, 446 U.S. at 695-696), even though the *second* clause does (*Ernst*, 425 U.S. at 199). Its terms are satisfied whenever a covered defendant makes a material misstatement or omission, irrespective of the actor's intent. And it

10

does so in the context of a statute mandating *disclosure* so shareholders can make informed decisions. *Schreiber* v. *Burlington N., Inc.*, 472 U.S. 1, 8-10 (1985). A *negligent* misstatement or omission is still a misstatement or omission, and it still deprives shareholders of necessary information. If Congress wanted to restrict Section 14(e)'s reach to intentional wrongdoing, it assuredly knew how to do it.[2]

2. This Court has already twice construed indistinguishable language as requiring negligence, not scienter.

*First*, the Court in *Aaron* so held for Section 17(a)(2), which prohibits "obtain[ing] money or property by means of any untrue statement of a material fact or any [material] omission." 15 U.S.C. 77q(a)(2); compare 15 U.S.C. 78n(e) (using indistinguishable terms). As *Aaron* explained, that language is "devoid of any suggestion whatsoever of a scienter requirement." 446 U.S. at 696. It quoted a "well-known commentator" as noting "'[t]here is nothing on the face of [Section 17(a)(2)] itself which smacks of *scienter* or intent to defraud." *Ibid.* (quoting 3 L. Loss, *Securities Regulation* 1442 (2d ed. 1961)).[3] While

---

[2] This reading is further reinforced by Congress's categorical language. The section on its face targets "*any* untrue statement"; the word "any" necessarily covers the entire universe of "untrue statements," which includes the subcategory of *negligent* untrue statements. If Congress wished to exclude certain misstatements from Section 14(e)'s reach, it would have chosen a different modifier for the operative text. Nor can petitioners tease out a "scienter" element by redefining the common meaning of Congress's words. In this context, no one reads "untrue" to mean "dishonest" or "misleading" to mean "deceptive" (Pet. Br. 28)—which itself would render Section 14(e)'s second clause superfluous.

[3] That same "well-known commentator" examined Section 14(e)'s text and concluded its first clause likewise requires negligence, not scienter. L. Loss, et al., *Fundamentals of Securities Regulation* 652

11

other parts of Section 17(a) might require scienter, this Court found that Section 17(a)(2)'s language "compel[s] the conclusion" that "scienter" is not "required." *Id.* at 697.

Petitioners have no real answer for the obvious parallel between Sections 14(e) and 17(a)(2). *Aaron* read materially indistinguishable language to "mean what it so plainly seems to say"—that scienter was *not* required. 446 U.S. at 697. There is simply no basis for assigning the same words a different meaning here.

In response, petitioners argue *Aaron* is distinguishable because (i) Section 17(a) is not privately enforceable, and (ii) *Aaron* involved claims for injunctive relief. Br. 36-39. Both points are wrong. As for the first: the relevant question is not *who* enforces these sections, but *what these sections mean*; the "identity of the plaintiff" is irrelevant. *Aaron*, 446 U.S. at 691 (so holding). As for the second: the right inquiry is not what relief is available once culpability is established, but *the standard for establishing culpability*. *Ibid.* (rejecting the proposition that the standard turns on "the identity of the plaintiff or *the nature of the relief sought*") (emphasis added). *Aaron* examined the plain text and determined intent was not required to prove a violation. The language in each section (Sections 14(e) and 17(a)(2)) is indistinguishable, and *Aaron* construed that language on its face to require only negligence, not scienter.

*Second*, this Court in *Ernst* read the same language the same way, finding that Rule 10b-5(b)'s parallel text

(5th ed. 2004) ("The Supreme Court's construction of § 17(a) should govern so as to conclude that scienter (whatever its meaning) is required by the 'fraudulent' and 'deceptive' clause of § 14(e), which more or less tracks § 17(a)(1) of the 1933 Act, and § 10(b) of the 1934 Act, but not the untrue statement clause, which *precisely* tracks § 17(a)(2).") (reproduced at C.A. E.R. 190).

12

"could encompass both intentional and negligent behavior." 425 U.S. at 212-213. As the Court explained, Rule 10b-5(b)'s language, "[v]iewed in isolation," proscribes "any type of material misstatement or omission," "whether the wrongdoing was intentional or not." *Ibid.*; accord *Aaron*, 446 U.S. at 696 (reaffirming this point). While *Ernst* ultimately adopted a different reading, it did so for *independent* reasons, none of which apply here. See *Ernst*, 425 U.S. at 212-213 (explaining that, under its natural reading, Rule 10b-5 would "exceed" the SEC's rulemaking authority, given Section 10(b)'s narrow focus on "intentional wrongdoing").

In response, petitioners argue that, whatever its reasoning, *Ernst* still "held" that scienter was required, and Section 14(e) tracks Section 10(b) and Rule 10b-5. Pet. 29-30. This is perplexing. *Ernst*'s disposition turned on the limited scope of Section 10(b), not the broader language in Rule 10b-5. See *Aaron*, 446 U.S. at 690 (so noting). As *Ernst* explained, Section 10(b), unlike Section 14(e), focused *exclusively* on concepts invoking scienter ("manipulation," "deception," etc.). 425 U.S. at 197-199. Because Section 10(b) required scienter, Rule 10b-5 also had to require scienter; otherwise, the SEC's rule would "exceed" the scope of its rulemaking authority. *Id.* at 212-213.[4]

Those points have nothing to do with Section 14(e). Its two clauses are each found in a *statute*, not a regulation. There is no concern of the SEC exceeding its authority,

---

[4] Contrary to petitioners' contention, *Ernst*'s emphasis was not its brief reference to "'procedural restrictions'" (Pet. 32); the Court was clear that Section 10(b)'s language drove the analysis. *Ernst*, 425 U.S. at 200-201 (focusing "primarily on the language of that section"); see also *Aaron*, 446 U.S. at 690 (*Ernst*'s "most important" consideration "was the plain meaning of the language of § 10(b)"). Petitioners are wrong to minimize the Court's paramount focus on the language itself.

13

because the question is what *Congress* itself wrote into the statute. And while Section 14(e)'s second clause mirrors Section 10(b)'s language, its first clause has no counterpart in Section 10(b). That first clause sweeps beyond Section 10(b)'s narrow focus, and its terms are "devoid of any suggestion whatsoever of a scienter requirement." *Aaron*, 446 U.S. at 696. For exactly those reasons, this Court readily concluded that Section 17(a)(2) required negligence, not scienter, despite its parallels to Section 10(b) and Rule 10b-5. The same logic inescapably applies here. See also, *e.g.*, *Pryor* v. *U.S. Steel Corp.*, 591 F. Supp. 942, 955 n.19 (S.D.N.Y. 1984).

3. Petitioners' further efforts to avoid the plain text fall short.[5]

a. Petitioners insist that Section 14(e)'s separate clauses must be read together to impose a unitary scienter requirement. Pet. Br. 26-27. But this Court already rejected that proposition in *Aaron*, holding that no "uniform" treatment was required. 446 U.S. at 697. It explained that provisions like this are properly read as targeting separate categories, each with their own independent requirements. *Ibid.* ("each subparagraph of § 17(a) 'proscribes a distinct category of misconduct'"). This is confirmed by "the use of an infinitive to introduce each of

---

[5] As one of their lead arguments, petitioners focus on explaining why they believe Section 14(e) does *not* require negligence, as opposed to explaining why it *does* require scienter. Br. 24-25. Aside from confirming petitioners' lack of confidence in their ability to establish scienter, this point wholly misses the mark. In its past cases (in *Ernst* and *Aaron*), this Court has always treated the decision as a choice between scienter and negligence, and the government has explained why that is likely so. See U.S. Br. 24-26. In this case, it was uncontested below that the standard was at least negligence, so that is all respondents are defending here. And while there is a textual basis for strict liability, the pertinent point is there most certainly is *not* a textual basis for scienter.

14

[the] subsections, and the use of the conjunction 'or' at the end of the first two." *United States* v. *Naftalin*, 441 U.S. 768, 774 (1979). Had Congress wanted identical coverage under each clause, it would have used the same wording in each section. *Id.* at 773-774. Instead, Congress outlined "distinct categor[ies] of misconduct" because "[e]ach succeeding prohibition is meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections." *Id.* at 774; accord *Aaron*, 446 U.S. at 697.

That reasoning controls here. As with Section 17(a), Section 14(e)'s clauses are phrased in the disjunctive, and each clause is "introduce[d]" with "an infinitive." *Naftalin*, 441 U.S. at 774. Congress enumerated two prohibitions to establish liability if one "*or*" the other is met; it did not separate out independent commands (each with its own infinitive) only to collapse the two together. See, *e.g.*, *McFarland* v. *Wells Fargo Bank, N.A.*, 810 F.3d 273, 285 (4th Cir. 2016); *United States* v. *Sheldon*, 755 F.3d 1047, 1050 (9th Cir. 2014); *Stevens* v. *Employer-Teamsters Joint Council No. 84 Pension Fund*, 979 F.2d 444, 452 (6th Cir. 1992).

Moreover, petitioners' reading invites an obvious surplusage problem: if each clause requires scienter, then these two separate provisions, drafted in conspicuously different terms, would cover the same conduct. An *intentional* "untrue statement" surely qualifies as a "fraudulent, deceptive, or manipulative act[] or practice[]" (15 U.S.C. 78n(e)), leaving nothing for Section 14(e)'s first clause to do. These clauses use different language to invoke different prohibitions, and the Ninth Circuit's construction gives independent meaning to "'each distinct category of misconduct.'" *Aaron*, 446 U.S. at 697. Petitioners' theory, by contrast, reads the first clause straight out of the statute. See *Lane* v. *United States*, 286 F.3d 723,

15

730-731 (4th Cir. 2002). That is not what any ordinary application of the so-called "whole-text canon" (Pet. Br. 27) is designed to do.

Finally, while petitioners are assuredly correct that Section 17(a) is broken into formal "subparagraphs" and Section 14(e) is not (Br. 37), this Court looked primarily at "the words themselves," not "the use of separate numbers to introduce each subsection." *Naftalin*, 441 U.S. at 774 n.5. The section's "'punctuation'" was addressed only in a single footnote as mere "confirmation" for the language appearing "'on the face of the statute.'" *Ibid.* At bottom, the operative language did the work. And while petitioners emphasize that Section 14(e) is a "single sentence" (Br. 37), they overlook that *the same is true* for Section 17(a): it may have multiple "subparagraphs," but it only has a single period.

b. Nor does noscitur a sociis require a different outcome. Pet. Br. 27-28. That canon cannot override each clause's unambiguous language, and petitioners cannot explain why the second clause (with its distinct prohibition) should artificially limit the first clause's natural scope. *In re Continental Airlines, Inc.*, 932 F.2d 282, 288 (3d Cir. 1991). Petitioners might have a point if Congress had prohibited [1] "mak[ing] any untrue statement" or [2] "engag[ing] in any *other* fraudulent, deceptive, or manipulative" act. But "Congress did not write the statute that way." *Naftalin*, 441 U.S. at 773. Congress isolated the terms invoking scienter to a distinct clause, and clearly delineated the section's *two* prohibitions by phrasing them in the disjunctive, introducing each with the infinitive "to." "When Congress has separated terms with the conjunction 'or,' it is presumed that Congress intended to

16

give the terms 'their separate, normal meanings.'" *Ibid.* (quoting *Garcia* v. *United States*, 469 U.S. 70, 73 (1984)).[6]

In sum, just as there was no reason in *Aaron* to distort Section 17(a)(2)'s natural meaning due to its "neighbor[ing]" clauses (Pet. 17), there is no reason to distort Section 14(e)'s first clause here. Petitioners have no legal or logical basis for reading this distinct language to impose a uniform culpability requirement. See, *e.g.*, *Aaron*, 446 U.S. at 697 (rejecting an analogous proposition).

c. Petitioners also focus on Section 14(e)'s limited rulemaking delegation to the SEC (Br. 28-29 n.7), but this only proves *respondents'* point. That delegation authorizes the SEC to regulate actions falling within Section 14(e)'s *second* clause, but not its first. 15 U.S.C. 78n(e) (limiting the SEC's focus to "acts and practices" that "are fraudulent, deceptive, or manipulative"). If Congress felt both clauses covered the same ground, it would have authorized rulemaking under the entire subsection. The limited delegation reaffirms that Congress saw an obvious difference between the two provisions, each warranting its own separate treatment.

Petitioners ask why Congress would authorize the SEC to combat only "[]fraud" if Section 14(e)'s first clause covers negligence. The answer is obvious: The second clause requires more guidance. The first clause covers misstatements and omissions, which are known quantities

---

[6] A better use of noscitur a sociis here is construing the three words in the *second* clause by "the company [they] keep[]" (*Yates* v. *United States*, 135 S. Ct. 1074, 1085 (2015))—which is why it makes sense to require scienter for "manipulative" or "deceptive" acts. But it makes no more sense to impose a scienter requirement for the first clause than it would to *eliminate* one for the second—even though the first clause is naturally read to capture only *negligence* and in fact *precedes* the second part of the sentence.

17

with established meanings. They require little elaboration.[7] That is not true of the second category, which covers *any* unspecified "act[]" or "practice[]" that is "fraudulent, deceptive, or manipulative." That undefined conduct begs for rules clarifying stakeholders' rights and obligations. Congress's targeted delegation says nothing about the standards to prove a violation under the first clause.

d. Petitioners argue that the outcome in *Ernst* turned not on the text, but Section 10(b)'s absence of "'significant procedural restrictions'"—and Congress would not authorize an action for "mere negligence" without imposing the same safeguards found in its "express causes of action[]." Pet. Br. 31-34 (citing *Ernst*, 425 U.S. at 208-209). Petitioners have misread *Ernst*: the Court's concern was not the absence of procedural restrictions *per se*, but the reality that extending the "remedy under § 10(b)" would "nullify" the *express* actions under other sections (by covering the same ground). *Ernst*, 425 U.S. at 209 (discussing Section 10(b)'s substantive overlap with "causes of action covered by §§ 11, 12(2), and 15"). There is no such concern with Section 14(e)'s targeted prohibitions in the tender context.[8]

In any event, petitioners' argument fails on multiple other fronts. Their same concerns, for example, undoubtedly would apply to recognizing a cause of action for negligence under Section 14(a), which courts have uniformly construed as requiring negligence, not scienter. See Part I.A.4, *infra*. Yet that private action has been recognized for over 50 years without any repudiation by Congress.

---

[7] Anyhow, the SEC had *preexisting* authority under Section 14(d) to regulate mandatory disclosures for tender offers, including any misstatements or omissions. 15 U.S.C. 78n(d)(4).

[8] Besides, the culpability standard is a *substantive* element; scienter is not a "procedural" restriction. Contra Pet. 18.

18

And petitioners ignore that their concerns have largely been addressed in the PSLRA. To the extent petitioners worry about discovery and fees, Section 78u-4 accounts for both: it imposes mandatory stays pending the disposition of a motion to dismiss, and it requires mandatory sanctions (including the award of attorney's fees) for baseless filings. 15 U.S.C. 78u-4(b)(3), (c). Congress imposed those requirements on "any private action arising under this chapter," and thus chose to mitigate the potential effects of implied actions rather than repeal them entirely (or distort their natural elements).

As a final retort, petitioners argue that private actions under Section 14(e) would "circumvent" the "express cause of action in Section 18." Br. 3-4, 34-36. Petitioners are confused. Section 14(e) targets *any* statement (filed or otherwise) in a tender contest. It does not displace Section 18(a), which has a different focus: statements (of any kind) "filed" with the SEC. 15 U.S.C. 78r(a). The fact that there is some overlap between the two is unexceptional; overlap is found throughout the securities laws, as this Court has repeatedly recognized. See, *e.g.*, *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 383 (1983). Congress understood that heightened protection was necessary in this specific area, which is why it enacted protections for this specific context. If Congress wanted all plaintiffs to usher their claims through Section 18, it would not have added Section 14(e) to the mix.[9]

---

[9] Additionally, this Court has noted that Congress "may well" have intended Section 14(e) to dispense with the purchaser/seller requirement found in both Section 10(b) and Section 18(a). See *Piper*, 430 U.S. at 38-39; see also *H. K. Porter Co.* v. *Nicholson File Co.*, 482 F.2d 421, 424 (1st Cir. 1973). Indeed, forcing shareholders to invoke Section 18(a) or Section 10(b) to bring claims in the tender-offer context—and thereby satisfy the purchaser/seller requirement—would

19

In short, contrary to petitioners' contention, *Ernst*'s single paragraph on this point does not stand for the sweeping proposition that negligence standards are always verboten in implied rights of action.

4. Finally, a scienter requirement is incompatible with Section 14's broader statutory context. Congress enacted Section 14(e) to impose the same rules in the tender context that Section 14(a) already imposed in the proxy context. See, *e.g.*, *Adams* v. *Standard Knitting Mills, Inc.*, 623 F.2d 422, 430 (6th Cir. 1980) (Congress intended uniform "standards of liability" for Sections 14(a) and 14(e)). And courts have overwhelmingly recognized that negligence is sufficient to state a claim under Section 14(a). *DeKalb Cty. Pension Fund* v. *Transocean Ltd.*, 817 F.3d 393, 409 & n.95 (2d Cir. 2016).

Proxy solicitations and tender offers represent different ways to accomplish effectively the same thing. That is why Congress deliberately acted to "remedy [a] gap" in the securities laws by subjecting the two schemes to the same form of regulation. *Piper*, 430 U.S. at 22. There is no obvious reason for adopting a different liability standard under Section 14(e); petitioners' contrary position would introduce a puzzling discontinuity in the regulatory scheme. See U.S. Br. 22-24.

**B.  The Section's Purpose And History Confirm That Scienter Is Not Required**

1. Petitioners' theory would also undermine Congress's objectives. Congress enacted Section 14(e) to pro-

---

essentially foreclose shareholders from seeking equitable relief, which would be entirely at odds with the purpose of the Williams Act: to ensure shareholders have access to material information *before* deciding whether to keep or tender their shares. See *Piper*, 430 U.S. at 22-24, 42.

20

tect shareholders, and its chief instrument was "disclosure." *Schreiber*, 472 U.S. at 11-12. The Act thus affirmed the offeror's obligation "to make full disclosure of material information" (H.R. Rep. No. 1711, 90th Cong., 2d Sess. 11 (1968)), arming shareholders with the facts necessary to make intelligent decisions. *United States* v. *O'Hagan*, 521 U.S. 642, 667-668 (1997); *Piper* v. *Chris-Craft Indus., Inc.*, 430 U.S. 1, 30-31 (1977).

That purpose is frustrated when corporate actors fail to furnish material information, whether the error is intentional or not. A negligence standard thus "serve[s] to reinforce the high duty of care owed by a controlling corporation" to its shareholders (*Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300 (2d Cir. 1973)), especially when making critical decisions. Congress expected corporate statements to be correct—which is why it declared it "unlawful" to "make *any* untrue statement" or "omi[ssion]." 15 U.S.C. 78n(e) (emphasis added). Requiring scienter would give careless violators a free pass despite making "untrue statements" falling within the heartland of Section 14(e); that result would needlessly undercut Congress's disclosure mandate.

Section 14(e)'s context also differs from other areas where scienter makes more sense. Rule 10b-5 cases, for example, often target speakers under no "obligation" to say anything. *Gerstle*, 478 F.2d at 1300. An innocent mistake on a non-mandatory topic requires heightened protection, which preserves the incentive for speakers to voluntarily disclose information. *Ibid.*; see also, *e.g.*, *SEC* v. *Texas Gulf Sulphur Co.*, 401 F.2d 833, 866-867 (2d Cir. 1968) (Friendly, J., concurring) ("If the only choices open to a corporation are either to remain silent and let false rumors do their work, or to make a communication, *not legally required*, at the risk that a slip of the pen or failure properly to amass or weigh the facts * * * will lead to

21

large judgments," "most corporations would opt for the former") (emphasis added).

Those concerns have little place in the context of compulsory disclosures. Sections 14(a) and 14(e) govern compulsory statements required by law before corporate mergers can be submitted for shareholder approval. In that different context, speakers are required to provide necessary information so shareholders can make informed decisions. While the decision to voluntarily speak on other topics is sensibly left to a higher bar, Section 14(e)'s plain text reflects Congress's intent to subject these disclosures to more stringent review.[10]

2. Petitioners also suggest that authorizing a negligence standard will encourage litigation abuse. This concern is unfounded. Congress's aims are not frustrated by ensuring that mandatory disclosures are in fact *disclosed*. And it will be the exceptionally rare case where a negligence standard is the deciding factor between filing a claim or letting a material misstatement off the hook. Moreover, courts have been enforcing private actions under Section 14(a) for decades, and petitioners have failed

---

[10] Petitioners invoke Judge Friendly's observation of the "frightening" consequences of adopting a negligence standard under Section 10(b) and Rule 10b-5, and suggest the same concerns arise in these "analogous circumstances." See Pet. Br. 34 (quoting *Texas Gulf*, 401 F.2d at 866-867 (Friendly, J., concurring)). This point has already been refuted by—Judge Friendly himself: While "[i]mposition of too liberal a standard with respect to culpability" would deter "statements issued by corporations[] without legal obligation to do so," "*[s]uch considerations do not apply*" to "proxy statement[s] *required by the Proxy Rules*." On the contrary, "a broad standard of culpability here will serve to reinforce the high duty of care owed by a controlling corporation to minority shareholders in the preparation of a proxy statement seeking their acquiescence in this sort of transaction * * * ." *Gerstle*, 478 F.2d at 1300 (Friendly, J.) (emphasis added) (drawing an explicit contrast to Rule 10b-5 and *Texas Gulf*).

22

to explain how a negligence standard in that parallel context has produced any concrete harm. If some shareholders are filing abusive suits, the courts should calibrate the solution to the problem—and punish those shareholders for filing abusive suits. They should not adopt the non-linear solution of requiring scienter (or any other random element) to deter meritless filings.

a. A negligence standard properly holds corporate actors responsible for failing to deliver the facts essential for informed shareholder decision-making. Petitioners may nevertheless insist the sky is about to fall, but this grave prediction is overblown. The elements of securities claims (especially materiality) are notoriously difficult to prove. Plaintiffs must cross multiple thresholds to survive a motion to dismiss, including the PSLRA's other heightened-pleading requirements. 15 U.S.C. 78u-4(b)(1)(A)-(B). That Section 14(e)'s first clause does not require scienter does not mean weak claims get a free pass.[11]

b. Petitioners also ignore the profound benefits produced by legitimate shareholder lawsuits. Congress demanded that companies disclose material facts in the tender context. Yet the desire to consummate a merger can encourage selective disclosure, and there are documented incentives for investment banks to whitewash fairness opinions. L. Bebchuk, et al., *Fairness Opinions: How Fair Are They and What Can Be Done About It?*, 1989 Duke L.J. 27, 30 (Feb. 1989). The SEC lacks the resources to monitor each recommendation statement in real-time.

---

[11] Petitioners argue the Ninth Circuit's decision is at odds with the PSLRA's objectives. But Congress could have required scienter across the board; it instead recognized that not every securities claim warrants scienter, and required a "strong inference" only for those that do. 15 U.S.C. 78u-4(b)(2)(A). Petitioners cannot substitute Congress's scalpel with a sledgehammer.

23

*E.g.*, *J.I. Case Co.* v. *Borak*, 377 U.S. 426, 432 (1964). Section 14(e), by design, keeps the process honest. See, *e.g.*, *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (recognizing the role of "meritorious private actions" in enforcing securities laws and supplementing USDOJ and SEC efforts).

This very case illustrates the point. Here, Emulex refused to provide relevant information (Goldman Sachs's premium analysis) on a marginal tender offer. The proposal was an obvious close call, with barely 60% of outstanding shares ultimately tendered. J.A. 179. Reasonable investors would surely be interested to know that Goldman Sachs identified comparable transactions and found that this offer fell in the bottom end. J.A. 77-78, 255 (44.8% (mean) and 50.8% (median) versus 26.4% (Emulex)); see *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 30-31 (2011).

While this does not automatically establish the transaction was unfair, Section 14's entire point is letting the market decide fairness for itself. *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 448 (1976). Petitioners deprived shareholders of key information that Goldman Sachs found sufficiently important to include in its own analysis. (Goldman Sachs does not often waste a board's time with irrelevant material.) That information cut against the offer's fairness, and shareholders were entitled to the information under Section 14(e). It is unclear why a scienter standard should excuse petitioners' mistake.

c. Petitioners also overlook the available solutions that already exist to police meritless claims—and that are actually tailored to deal with the abuse, not to artificially rachet up certain elements even for *meritorious* claims.

24

Among others: Federal courts could refuse to award fees absent *material* disclosures, thus ensuring the litigation accomplishes Congress's objectives—and deterring filings that are unlikely to produce worthwhile disclosures. See, *e.g.*, *In re Walgreen Co. Shareholder Litig.*, 832 F.3d 718, 725 (7th Cir. 2016). They can disqualify class counsel for pursuing fee-driven litigation. *Id.* at 726. They can award sanctions for baseless filings under Fed. R. Civ. P. 11. They can engage in the PSLRA's mandatory-sanctions process after the final adjudication of a frivolous claim. 15 U.S.C. 78u-4(c). And they can enforce the PSLRA's heightened-pleading standards, which are designed to knock out weak claims—indeed, on the same motion that petitioners would like to use to argue scienter. See 15 U.S.C. 78u-4(b).

The fact is that petitioners have all the tools available for escaping and avoiding meritless claims; imposing an atextual scienter requirement would simply excuse liability for a careless corporate actor who failed to make a material disclosure—and thus, by definition, prejudiced investors from making the informed decision that is their right under Section 14(e). Nothing about that position promotes Congress's objectives.[12]

---

[12] SIFMA's amicus brief is effectively a broadside against private securities litigation generally. See, *e.g.*, SIFMA Br. 11-28. Some organizations may not like the securities laws, but the question here is how best to read the text, purpose, and history of Section 14(e) to determine its proper elements; the answer is not to abandon all traditional tools of statutory interpretation to adopt whatever construction happens to minimize securities claims. And if SIFMA believes the securities laws are too prone to abuse, its proper audience is Congress, not the courts. The political branches have proven perfectly capable of adopting new rules to police abusive securities practices. If policymakers believe the tender context is ripe for new regulation, Congress is well-equipped to solve the problem.

25

### C. Petitioners Are Incorrect That Courts Are Required To Construe All Private Rights Of Action In Favor Of Avoiding Liability

As a last-ditch effort, petitioners maintain that all private rights of action must be construed narrowly. Br. 21-22. Contrary to petitioners' contention, implied rights of action do not always and automatically assume the smallest possible footprint to minimize liability. The question turns on congressional intent, including the proper reading of the provision's text, context, structure, and purpose. See, *e.g.*, *Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001); *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 175 (1994); *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1104-1105 (1991).

Here, there is no genuine doubt about the meaning of Section 14(e)'s first clause. Its text has no scienter requirement, and this Court has rejected (repeatedly) the argument that indistinguishable language requires scienter. The only text that is even possibly consistent with scienter is found in Section 14(e)'s *second* clause, which is textually and analytically distinct from its first. And the statutory objective is advanced by capturing "any" wrongful disclosures (negligent or otherwise), just as the language says.

This may be an implied right of action, but it was one contemplated by Congress, and Congress likewise would have expected courts to employ the usual tools of construction to determine its scope. Petitioners' contrary contention is wrong, and the judge accordingly should be affirmed.

26

## II. PETITIONERS' CHALLENGE TO SECTION 14(e)'S PRIVATE RIGHT OF ACTION IS BOTH MERITLESS AND NOT PROPERLY BEFORE THE COURT

### A. Petitioners Waived The Challenge By Expressly Conceding The Issue Below

1. Having lost on the culpability issue below, petitioners now argue that Section 14(e) is not privately enforceable. This is meritless. First and foremost, the Court generally refuses to consider "'questions not raised or resolved in the lower court[s].'" *Taylor* v. *Freeland & Kronz*, 503 U.S. 638, 646 (1992) (alteration in original). "Although in some instances [the Court] ha[s] allowed a respondent to *defend* a judgment on grounds other than those pressed or passed upon below, it is quite a different matter to allow a petition to assert new substantive arguments *attacking*, rather than defending, the judgment when those arguments were not pressed in the court whose opinion we are reviewing or at least passed upon by it." *United States* v. *United Foods, Inc.*, 533 U.S. 405, 417 (2001) (emphases added) (citation omitted).

Petitioners are attempting to do just that. Petitioners' new argument was not resolved below because it was not *raised* below. On the contrary, petitioners expressly conceded the point: "defendants do not dispute that *Section 14(e)* provides for a private right of action." Emulex C.A. Br. 47; see also Avago C.A. Br. 4 ("join[ing] and incorporat[ing] by reference" Emulex's brief). Petitioners accordingly did not even attempt to preserve the issue below (not even in a footnote), but explicitly conceded the question. Petitioners are bound by that waiver, and it is too late now to revisit their tactical decision. See, *e.g.*, *Chaidez* v. *United States*, 568 U.S. 342, 357 n.16 (2010) (while considering a *Teague* retroactivity analysis, refusing to consider petitioner's "back-up arguments" that *Teague* did

27

not even apply, because they were made for the first time in the petitioner's opening brief).

In response, petitioners now say they argued the point on rehearing. See Br. 43 n.12 (citing Emulex C.A. Reh'g Pet. 14). Not exactly. The cited page has a single oblique reference tossed in at the end of a paragraph devoted to an entirely different point—the idea that an implied damages remedy cannot be based on negligent conduct. There was no express statement that Section 14(e) was not privately enforceable, much less any argument that existing circuit precedent had been undermined by subsequent authority. If petitioners tried to assert this argument below, it would be deemed waived. See, *e.g.*, *United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). There is no reason this Court should be more lenient.

2. For its part, the government agrees that petitioners did not preserve the issue below. See U.S. Br. 27 ("In the courts below, petitioners did not dispute that Section 14(e) can be enforced through private suits."). But the government excuses their failing because the new argument is "fairly included" within the question presented. *Ibid.* (quoting Sup. Ct. R. 14.1(a)). This misses the point. Nothing in this Court's Rule says that the phrasing of a question presented can *revive* an abandoned or conceded point—a narrow question simply creates an opportunity to *abandon* a point that was actually preserved below. It would be an unusual rule that lets litigants shift gears unilaterally by casting a wider net with the question presented.

3. As a matter of power or prudence, this issue is inappropriate for review. There is no circuit conflict; not a single court below grappled with any of the relevant arguments; indeed, it appears that not a single court *anywhere*

28

has assessed the full panoply of arguments. And percolation would have an added benefit here, since it would put Congress on notice; if this Court guesses wrong and uproots the uniform practice below, it will have upset a securities scheme that has ably protected shareholder rights for decades. A short delay will give the political branches time to weigh in—should they see any need to revise the overwhelming consensus on this issue.

In the end, this Court is "a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U.S. 709, 718 n.7 (2005). If the Court wants to rethink half a century of settled practice, it should at least wait for a vehicle where the question presented was not expressly abandoned below. See, *e.g.*, *Glover* v. *United States*, 531 U.S. 198, 205 (2001) (refusing to consider "questions neither raised nor resolved below"); *Yee* v. *City of Escondido*, 503 U.S. 519, 538 (1992) ("[p]rudence" dictates "awaiting * * * the benefit of * * * lower court opinions squarely addressing the question"); *Youakim* v. *Miller*, 425 U.S. 231, 234 (1976) (absent "exceptional" circumstances, this Court does not grant review on "questions not pressed or passed upon below").[13]

**B.  Section 14(e) Creates A Private Right Of Action**

If the Court does choose to reach this question, it has been clear for 50 years that Congress authorized private litigants to sue for Section 14(e) violations.

This question ultimately turns on "congressional intent" (*Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 578 (1979)), and Congress's intent here is unmistakable. Congress enacted Section 14(e) to "harmonize" the regulation

---

[13] Indeed, if petitioners and their amici genuinely believe this is a serious question, it is ample reason for dismissing the petition as improvidently granted. There is no reason for the Court to consume its limited bandwidth deciding the proper elements of a right of action that petitioners (wrongly) believe does not exist.

29

of proxy solicitations and tender offers. In doing so, Congress chose the verbatim textual formulation for Section 14(e) that courts had already declared privately enforceable for Rule 10b-5; there is no reason to presume that Congress expected those same words to carry a different meaning in this related setting. Indeed, on the contrary, Congress acted on the heels of this Court's decision in *Borak*, which declared Section 14(a) privately enforceable. Congress would not fill the "gap" between Section 14(a) and Section 14(e) by creating an artificial disparity between their primary means of enforcement. This is perhaps why the overwhelming judicial consensus for the past half-century has authorized private lawsuits for Section 14(e) violations—and Congress has not only refused to repudiate the practice, but it has effectively endorsed it.

Although petitioners and the government frame the issue as recognizing a "new" cause of action, there is nothing new about it. Congress has been aware of this robust judicial authority for five decades, and there is no obvious basis for the judiciary to supplant the judgment of the political branches on this important question. The unique factors at issue qualify for a rare private right of action under this Court's settled jurisprudence. If petitioners are dissatisfied with that result, it is safe to say the ball is now squarely in Congress's court.

### 1. Congress adopted the verbatim formulation of Rule 10b-5, which gives rise to private remedies

a. First and foremost, Congress "modeled" Section 14(e) after the language in Rule 10b-5 (*Schreiber*, 472 U.S. at 10-11), which was already recognized as creating private rights. *E.g.*, *Superintendent of Ins.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). When Congress invoked the same textual formulation in the same statutory

30

scheme, there is every reason to think it intended the same result.

Indeed, *Alexander* v. *Sandoval*, 532 U.S. 275 (2001), itself acknowledged this common-sense proposition. See 532 U.S. at 280, 288. It recounted the situation in *Cannon* v. *Univ. of Chicago*, 441 U.S. 677 (1979), where Congress "'patterned'" Title IX after Title VI of the Civil Rights Act of 1964. *Id.* at 280. As the Court explained, when Title IX was enacted, "'the [parallel] language in Title VI had already been construed as creating a private remedy.'" *Ibid.* It thus followed that "Congress had intended Title IX, like Title VI, to provide a private cause of action." *Ibid.*

That same proposition squarely applies here. Both petitioners and the government agree that Congress deliberately "modeled" Section 14(e) on Rule 10b-5. Pet. Br. 3, 16, 17; U.S. Br. 6. It essentially adopted the Rule's verbatim formulation, leaving the two provisions with "nearly identical language." U.S. Br. 6; Pet. App. 9a (recognizing the "shared text"). This gives rise to more than mere presumptions: when Congress enacts "the verbatim statutory text" that courts previously "interpreted to create private rights," it naturally expects the same language to produce the same result. *Sandoval*, 532 U.S. at 288. Because Congress "patterned" Section 14(e) on the "parallel" language in Rule 10b-5 (Pet. Br. 30 n.8), it was inherently authorizing the same private action that courts had already accepted for decades under that Rule. See, *e.g.*, *Cannon*, 441 U.S. at 696-698.[14]

---

[14] Section 14(e) also closely tracks the language of Rule 14a-9, which *Borak* had just declared privately enforceable. *Borak*, 377 U.S. at 430-432; compare 15 U.S.C. 78n(e), with 17 C.F.R. 240.14a-9(a). This near-verbatim tracking is yet another reason to think Congress understood its new law supported private actions. See, *e.g.*, 113 Cong.

31

b. i. The government resists this straightforward construction for two reasons, but both are wrong.

*First*, the government admits that Section 14(e) "adopts language nearly verbatim from Rule 10b-5," which is privately enforceable. Br. 31. But, according to the government, because that same language is also found in Section 17(a), the relevant text has not been "uniformly" construed to create private rights. *Ibid.*

The government is confused. It makes no difference whether Section 17(a) is privately enforceable because (as all sides agree) *Congress modeled Section 14(e) on Rule 10b-5*, not Section 17(a). *Schreiber*, 472 U.S. at 10-11. The only relevant question is thus how Congress understood the language of Rule 10b-5, and it is "beyond peradventure" that Rule 10b-5 was understood as privately enforceable at Section 14(e)'s enactment. *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 380 (1983). When Congress chooses language that courts have already said is privately enforceable, then Congress has every expectation that using the "verbatim" text will produce the same result in the new provision. The question of legislative intent is thus obvious: Congress modeled Section 14(e)'s language after the language of a *specific* rule that everyone agreed was privately enforceable. It makes no difference if some other provision (that Congress was *not* copying) has a different meaning.[15]

Rec. 24,665 (1967) (confirming that the new additions were "patterned on the present law and the regulations which govern proxy contests") (statement of Sen. Williams); *Indiana Nat'l Corp.* v. *Rich*, 712 F.2d 1180, 1183 (7th Cir. 1983); see also *Cannon*, 441 U.S. at 694, 696-698; *Polaroid Corp.* v. *Disney*, 862 F.2d 987, 995-996 (3d Cir. 1988).

[15] Indeed, as petitioners specifically concede, "Congress modeled Section 14(e) on Rule 10b-5, not Section 17." Pet. Br. 28 n.10; see also U.S. Br. 6.

32

In any event, the government's position suffers from a chronology problem. The "'relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was.'" *Cannon*, 441 U.S. at 711. Even if Congress had glanced at Section 17(a), there was apparently not a single case declaring that section non-privately enforceable in 1968. On the contrary, "[b]efore this Court's decision in *Aaron*, several courts of appeals had inferred a private right of action under Section 17(a), usually by analogy to Section 10(b)." Pet. Br. 44 (so conceding). If anything, this suggests Section 17(a)'s contemporary treatment would have only reaffirmed that the language in Section 14(e) would create private rights.[16]

This reading is supported by *Sandoval* itself. The relevant inflection point is the period the legislation was enacted, and the question is thus whether "courts had *previously* interpreted [the parallel text] to create a private right of action." 532 U.S. at 288 (emphasis added). There is no legal or logical basis for asking what courts *subsequently* did more than a decade after the fact. Here, at the time of Section 14(e)'s enactment, courts had construed the relevant text one way—in favor of a private right of action. There is nothing in Section 17(a) that casts any doubt on the consistent treatment of the baseline language in Rule 10b-5, which, again, was the relevant "model" for Section 14(e). *Schreiber*, 472 U.S. at 10-11.

Finally, the government's other errors aside, there is no rule that says the text must "uniformly" support a private action (U.S. Br. 31), and the government's contrary

---

[16] In their lengthy submissions, neither petitioners nor the government cite a single decision declaring that Section 17(a) did not create private rights until a decade *after* Section 14(e)'s enactment. See U.S. Br. 31; Pet. Br. 44-45 & n.13.

33

view ignores the doctrine's animating rationale. This is ultimately a matter of "congressional intent." *Touche Ross*, 442 U.S. at 578; see also *Sandoval*, 532 U.S. at 286-287 (declaring "Congress's intent" the ultimate touchstone). The question is what the legislature had in mind when it chose a specific set of words for the statute. Where it self-consciously models legislation after a provision that courts universally accept as privately enforceable, there is no basis for courts to ascribe those same words the opposite effect, especially not *half a century* later. The government's plea would not honor Congress's statutory choices, but subvert them.

*Second*, the government also hints that it may be inappropriate to attribute any meaning to Congress's choice to mirror the words in Rule 10b-5, because that is merely a rule, and "Section 14(e) d[id] not incorporate the actual 'statutory text' of Section 10(b).'" U.S. Br. 31. This is legally and logically meritless. The principle, again, is rooted in the notion that Congress is put on notice of the effect of using certain language. It makes no difference whether that language is borrowed from a statute, a regulation, a rule, or a cocktail napkin. All that matters is that "courts had previously interpreted [the verbatim text] to create a private right of action." *Sandoval*, 532 U.S. at 288. The fact that previous *examples* of this rule's application happened to involve statutes is wholly besides the point.

ii. For their part, petitioners do not even acknowledge this doctrine at all. They repeatedly say (*e.g.*, Br. 38 n.10) that Section 14(e) is directly "bas[ed]" on Rule 10b-5 (in attempting to establish a scienter requirement), but they immediate ignore the consequences of that observation: The verbatim invocation of the old language means the

34

new language receives the same treatment. *Sandoval*, 532 U.S. at 288.[17]

In short, the courts recognized a private right under Section 10(b) and Rule 10b-5, which served as the linguistic model for Section 14(e). Congress understood that, when it used those words, the new section (like the old one) would be privately enforceable. *Sandoval*, 532 U.S. at 288; *Cannon*, 441 U.S. at 699. This Court routinely asks what statutory terms meant at the time of their enactment (*e.g.*, *Wisconsin Cent. Ltd.* v. *United States*, 138 S. Ct. 2067, 2070 (2018)), and this doctrine is cut from the same cloth. There is no basis for assigning these words a different meaning than they had when Congress enacted them, and nothing in this Court's implied-rights jurisprudence abandons that traditional respect for Congress's choices.

> ### 2. Congress enacted Section 14(e) to mirror the existing treatment of Section 14(a), which gives rise to private remedies

Eliminating the private action under Section 14(e) would also make nonsense of the statutory scheme. Congress's express purpose in the Williams Act was to eliminate the "gap" between the rules for proxies and tender offers, and Congress acted after this Court already held

---

[17] Nor does Congress's use of Rule 10b-5's language establish that Section 14(e) requires scienter (because Rule 10b-5, per *Ernst*, requires scienter). Contra Pet. Br. 30. Section 14(e) was enacted in 1968, when the courts were split over Rule 10b-5's culpability standard. See *Ernst*, 425 U.S. at 193 n.12. It was not until 1974 that this Court resolved that debate—and did so because of the controlling language of *Section 10(b)*, Rule 10b-5's authorizing statute. *Id.* at 212-214. At the relevant time, Congress chose language that is consistent with negligence, not scienter (see Part I, *supra*), and courts had already accepted that language created private rights. There is no indication that Congress intended to depart from the overwhelming consensus on that issue.

35

that the proxy rules were privately enforceable. There is no basis for thinking Congress intended to create polar-opposite liability schemes in legislation designed to "harmoniz[e]" these two areas. U.S. Br. 11-12 (so conceding).

Petitioners' contrary view would leave an anomaly in the securities laws and frustrate Congress's aim to put each scheme (proxies and tender offers) on equal footing. This Court has expressly held that, as with any other statutory question, Congress's intent to create a private remedy may sometimes "appear implicitly in the language or structure of the statute, or in the circumstances of its enactment." *Transamerica Mortg. Advisors, Inc.* v. *Lewis*, 444 U.S. 11, 18 (1979). The only sensible reading here is that Congress knew what it was doing when it adopted language that had long-given rise to a private action: Section 14(e), like its counterpart in Section 14(a), was privately enforceable.

a. In *J.I. Case Co.* v. *Borak*, 377 U.S. 426 (1964), this Court established that Section 14(a) and Rule 14a-9—regulating corporate proxy materials—create a private right of action. 377 U.S. at 430-433. Even though those provisions lacked any express indication of a private remedy, *Borak* held they were privately enforceable to effectuate Congress's "purpose" under Section 14(a). *Borak*, 377 U.S. at 433.[18]

While Section 14(a)'s existing scheme regulated proxy solicitations, there was no comparable regulation for tender offers. The Williams Act was designed to fill the "gap" between the two schemes (*Piper* v. *Chris-Craft Indus.*,

---

[18] Section 14(a) declares it "unlawful" to solicit proxies in violation of SEC rules, and Rule 14a-9 "prohibits solicitations 'containing any statement which * * * is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading * * *.'" *Mills* v. *Electric Auto-Lite Co.*, 396 U.S. 375, 383 (1970).

36

*Inc.*, 430 U.S. 1, 27 (1977)), thus "achiev[ing] Congress's goal of harmonizing the regulation of tender offers with the regulation of proxy solicitations under Section 14(a)." U.S. Br. 11-12; see also, *e.g.*, 113 Cong. Rec. 24,664 ("[a]ll have recognized the need to fill the existing gap") (statement of Sen. Williams). In doing so, Congress enacted a series of "parallel" rules for tender offers, including Section 14(e), which replicates Section 14(a)/Rule 14a-9's core protection. See U.S. Br. 24.

In considering the Williams Act, multiple witnesses testified before Congress that *Borak*'s logic would apply to Section 14(e), rendering the new regulation privately enforceable. See *Senate Comm. on Banking and Currency: Hearings Before the Subcomm. on Securities on S. 510*, 90th Cong., 1st Sess. 67 (1967) (statement of Prof. Carlos L. Israels); *id.* at 140 (statement of Prof. William H. Painter).

b. The government repeatedly acknowledges the "intended symmetry" between these two areas. U.S. Br. 23. But when it comes to explaining why only one gives rise to a private action, the government says—nothing. *Borak* first held that the proxy regulations were privately enforceable, and the Williams Act then sought to harmonize the two areas. *E.g.*, *Bath Indus., Inc.* v. *Blot*, 427 F.2d 97, 110 (7th Cir. 1970). The government could not identify a single reason that any rational legislative body would wish to authorize private actions under Section 14(a) but not Section 14(e). They both govern effectively indistinguishable transactions; each involves the same attempt to merge the same companies, preceded by the same disclosures to the same shareholders. The only difference is immaterial in any relevant sense: whether the transaction is carried out via a proxy solicitation or tender offer. And Congress specifically sought to eliminate the "sharp contrast" between the two. H.R. Rep. No. 1711, 90th Cong.,

37

2d Sess. 2-3 (1968) ("The cash tender offer is similar to a proxy contest, and the committee could find no reason to continue the present gap in the Federal securities laws which leaves the cash tender offer exempt from disclosure provisions.").

This Court's "modern" private-right-of-action juris-prudence imposes a high bar on recognizing a private remedy, but it does not require courts to abandon all the usual tools of statutory construction or check common sense at the door. At its irreducible core, the question is still one of statutory intent (*Sandoval*, 532 U.S. at 286; *Touche Ross*, 442 U.S. at 575-576), and Congress's intent here could not have been clearer: It understood from *Borak* and cases under Rule 10b-5 that its verbatim formu-lation would support private actions, and it enacted Sec-tion 14(e) to align the regulations for the two schemes. See, *e.g.*, *Cannon*, 441 U.S. at 698-699 & n.22; *id.* at 718 (Rehnquist, J., concurring). It is absurd to think the same Congress, acting against this backdrop, intended to create a puzzling discontinuity because it failed to invoke any ad-ditional "magic words."

In short, "unless we're going to revisit *Borak*—and lit-erally a 50-plus year understanding of the liability scheme for proxies—it makes no sense to say that plaintiffs are prohibited from suing for misrepresentations in tender of-fers under 14(e) while still permitting claims for false proxy statements under 14a-9." Ann Lipton, *The Puzzle of Emulex*, Business Law Prof Blog (Jan. 12, 2019) <ti-nyurl.com/securities-expert-on-emulex>. Neither peti-tioners nor the government can explain the blatant anom-aly their theory would introduce in a securities regime

38

that has sensibly governed the economy for half a century.[19]

### 3. Courts have uniformly held that a private right exists for the past 50 years, and Congress has made no attempt to disturb this settled practice

Section 14(e)'s private right of action has now been a settled feature of the securities laws for decades. This Court itself announced elements of Section 14(e)'s private right of action over thirty years ago, and the courts of appeals have uniformly held a private claim exists for half a century. Notwithstanding this overwhelming judicial consensus, Congress has not once cast any doubt on the claim's legitimacy, even when revamping the securities laws.

We are unaware of any situation, involving any other law, where the Court has rejected a private right of action that has become so entrenched for so long, without any hint of dissent or disapproval from the courts or political branches. If petitioners wish to suddenly upend this practice, their proper audience at this point is Congress, not this Court.

---

[19] Indeed, under their position, corporations would largely be able to infringe shareholders' suffrage rights by structuring mergers via a tender offer instead of a vote after a proxy solicitation. See, *e.g.*, Lipton, *supra*. Furthermore, petitioners and their amici overlook that corporations themselves have relied on a private right of action under Section 14(e) to challenge misleading disclosures in the context of hostile or competing tender offers. *E.g.*, *Gas Nat.* v. *E.ON AG*, 468 F. Supp. 2d 595 (S.D.N.Y. 2006); *Taro Pharm. Indus.* v. *Sun Pharm. Indus.*, 2010 U.S. Dist. LEXIS 84163 (S.D.N.Y. July 13, 2010); *Casey's Gen. Stores, Inc.* v. *Alimentation Couche-Tard, Inc.*, No. 4:10-cv-00265, 2010 U.S. Dist. LEXIS 101129 (S.D. Iowa Sep. 8, 2010).

39

a. According to petitioners and the government, this Court has not yet recognized a private right of action under Section 14(e). U.S. Br. 30-31; Pet. Br. 51. Yet in *Schreiber* v. *Burlington N., Inc.*, 472 U.S. 1 (1985), this Court *construed the elements* of a Section 14(e) private claim, without even hinting that the claim's existence was debatable. 472 U.S. at 2, 4, 12-13. It did not reserve the question, as it had done in *Piper* (which *Schreiber* cited three times). And it is inconceivable that the Court would have announced the elements of the claim without flagging for lower courts that the claim itself might not exist. The only explanation is the Court believed the question was settled by 1985 given the "overwhelming weight of authority" in the lower courts. *Smallwood* v. *Pearl Brewing Co.*, 489 F.2d 579, 596 n.20 (5th Cir. 1974).[20]

This Court is not in the habit of construing the elements of imaginary claims. When it decided *Schreiber*, it put Congress on clear notice that the courts, including this Court, were entertaining private actions under Section

---

[20] While *Piper* technically left the question open (430 U.S. at 42 n.28), it all but suggested shareholders had a private right of action. It repeatedly noted that Congress viewed shareholders as the "expressly protected class"; it suggested that non-tendering shareholders "could perhaps state a claim under § 14(e)"; and it affirmed that "the sole purpose of the Williams Act was the protection of investors." *Id.* at 35, 37-39. Indeed, the majority rejected out of hand the dissent's suggestion that it was depriving interested parties of "'effective enforcement,'" noting that its "narrow" holding solely eliminated standing for "a tender offeror[] suing in his capacity as a takeover bidder." *Id.* at 42 n.28. That would have been an empty response if the majority genuinely doubted that shareholders could lodge their own private actions.

40

14(e). If Congress felt those actions should not exist, it assuredly would have said so at some point over the last 35 years.[21]

b. Indeed, for half a century now, the courts have consistently authorized private actions under Section 14(e), and Congress has failed to repudiate that expansive body of authority. Compare, *e.g.*, *Touche Ross*, 442 at 577 n.19 (explaining the Court previously "acquiesced in the 25-year-old acceptance by the lower federal courts of an implied action under § 10(b)"); *Blue Chip Stamps*, 421 U.S. at 730 (accepting the "overwhelming consensus" that "a [private] cause of action did exist").

Every known circuit to have confronted the question has held that Section 14(e) is privately enforceable. See, *e.g.*, *Flaherty & Crumrine Preferred Income Fund, Inc.*, 565 F.3d 200 (5th Cir. 2009); *In re Digital Island Sec. Litig.*, 357 F.3d 322 (3d Cir. 2004); *Polaroid Corp.*, 862 F.2d at 995-996; *Feldbaum* v. *Avon Prods., Inc.*, 741 F.2d 234 (8th Cir. 1984); *Stull* v. *Bayard*, 561 F.2d 429, 432 (2d Cir. 1977); see also U.S. Br. 27 (conceding that "lower courts have long permitted private litigants to pursue claims under Section 14(e)"). And despite this consensus, Congress has repeatedly revamped core features of securities litigation without once suggesting that these private rights should not exist. And what Congress has done instead is telling.[22]

---

[21] This Court has since included *Schreiber* in a list of other established implied rights of action. See, *e.g.*, *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 172-173 (1994). Unlike this Court, however, neither petitioners nor the government even acknowledge *Schreiber*'s formal adjudication of a Section 14(e) private claim.

[22] Petitioners' sheepish concession that "some" lower courts (Br. 2) have so held is a remarkable understatement. And that is especially

41

First, Congress amended Section 14(e) itself in 1970 after multiple courts of appeals had already declared Section 14(e) privately enforceable. See *Susquehanna Corp.* v. *Pan Am. Sulphur Co.*, 423 F.2d 1075, 1076-1077 (5th Cir. 1970); *Electronic Specialty Co.* v. *Int'l Controls Corp.*, 409 F.2d 937, 946 (2d Cir. 1969) (Friendly, J.). Congress was presumably aware of those authorities, and yet it refused to eliminate Section 14(e)'s private action while amending the section. This effectively ratified those decisions. See, *e.g.*, *Caleb & Co.* v. *E.I. Du Pont de Nemours & Co.*, 615 F. Supp. 96, 99 (S.D.N.Y. 1985) ("By 1970 the courts had created a private right of action under § 14(e) * * * and Congress may be deemed to have been aware that the courts were upholding private rights of action directly under § 14(e)."); see also *Indiana Nat'l Corp.*, 712 F.2d at 1184.[23]

Second, Congress added an insider-trading prohibition to the Exchange Act in 1988. See Insider Trading and Securities Fraud Enforcement Act, Pub. L. No. 100-704, 102 Stat. 4680. This provision authorized a private action against insider trading (15 U.S.C. 78t-1(a)), yet instead of eliminating Section 14(e)'s private claims, Congress preserved all existing "express or implied rights of action." 15 U.S.C. 78t-1(d) ("Nothing in this section shall be construed to limit or condition the right of any person to bring an action to enforce a requirement of this chapter or the availability of any cause of action implied from a provision of this chapter.").

---

true given petitioners' failure to cite a single relevant decision supporting their novel theory.

[23] That amendment added the second sentence to Section 14(e), granting the SEC additional rulemaking authority. See Act of Dec. 22, 1970, Pub. L. No. 91-567, § 5, 84 Stat. 1497-1498.

42

This reservation is especially significant because Congress specifically noted that "insider trading" was already "prescribed by provisions of the securities laws, including * * * [Section] 14(e)" and "the case law that has developed over time interpreting those provisions." H.R. Rep. No. 910, 100th Cong., 2d Sess. 8 (1988); see also *id.* at 26 ("Although the courts have recognized an implied private right of action in insider trading cases, this section would codify an express right of action * * * ."). Congress thus expressly reaffirmed, not repudiated, implied rights of action in an area that directly overlaps with Section 14(e) and "the case law * * * interpreting [it]." That "case law" presumably includes decisions deeming Section 14(e) privately enforceable.

Finally, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67, 109 Stat. 737, to curb litigation abuse, but again refused to eliminate Section 14(e)'s private right of action. Indeed, not only did Congress modify pleading standards for all "private action[s]" (15 U.S.C. 78u-4(b)(1))—which presupposes *those actions rightfully exist*—but it also created a safe harbor for certain "forward-looking statements," including those "made in connection with a *tender offer*." 15 U.S.C. 78u-5(b)(2)(C) (emphasis added). That protection targeted "private action[s]" based "on an untrue statement of a material fact" or a material "omission." 15 U.S.C. 78u-5(c)(1). This new provision thus covers the core subject-matter of Section 14(e), creating the unmistakable impression that Congress was aware of private litigation under that section. It is implausible that Congress left that extensive, uniform body of authority untouched if

43

it actually disagreed with it. See *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008).[24]

### 4. *Petitioners and the government have failed to cast any genuine doubt on this settled regime*

According to petitioners and the government, Section 14(e) flunks the "modern" test for creating a private right of action, and the overwhelming contrary authority is simply wrong. This is specious. It would be rare indeed for so many judges to get something so wrong over such an extended period of time. As it happens, however, neither petitioners nor the government truly grappled with the key considerations supporting Section 14(e)'s private action. And the novel arguments they did lodge—which apparently not a single court has accepted—fall short.[25]

a. As an initial matter, contrary to the other side's contention, we are not relying on *Borak*'s (discredited) rationale or the fact that Section 14(e) was enacted during the "heyday" of the Court's old implied-rights jurisprudence. Pet. Br. 19; U.S. Br. 29. As established above, Section 14(e) is privately enforceable for reasons recognized,

---

[24] Petitioners lean on Section 203 of the PSLRA, which declares that the Act shall not "be deemed to create or ratify any implied private right of action, or to prevent the Commission, by rule or regulation, from restricting or otherwise regulating private actions under the Securities Exchange Act." Pub. L. No. 104-67, § 203, 109 Stat. 762. This generic disclaimer cannot overcome the salient point: Congress confronted the type of Section 14(e) private litigation authorized by courts everywhere, and yet declined to eliminate this longstanding private right of action. Petitioners are asking this Court to accomplish via judicial fiat what they failed to achieve via the political process.

[25] The government resists the notion that it is engaged in another flip-flop from its prior position before the Court. See U.S. Br. 28 (correctly noting the SEC's contrary position in the *Piper* case). But it is unusual to blame the government's past position on pre-*Cort* case law when *Piper* itself was a post-*Cort* case.

44

today, in this Court's jurisprudence—and reasons that derive inexorably from Congress's intent "to create [a] private right of action." *Sandoval*, 532 U.S. at 286. It may indeed be a "high bar" to establish that "Congress *intended* to provide a cause of action even though Congress did not expressly say as much in the text of the statute" (*Johnson* v. *Interstate Mgmt. Co.*, 849 F.3d 1093, 1097-1098 (D.C. Cir. 2017) (Kavanaugh, J.)), but this unique confluence of factors clears the threshold.

In any event, although not relevant to our primary arguments, the government and petitioners overstate their case. Section 14(e) may not have traditional "rights-creating" language (U.S. Br. 30), but the *entire statute* was designed to create rights. The Williams Act's "sole[]" purpose was to disclose information to shareholders for making informed decisions. *Piper*, 430 U.S. at 31. It rewrites the statutory history (and this Court's authority) to declare the Act was focused solely on prohibiting wrongful acts by defendants (U.S. Br. 30; Pet. Br. 31) as opposed to benefiting the investing public.[26]

b. According to petitioners (Br. 48-49), Section 14(e) cannot support *implied* remedies because the securities laws already provide *express* remedies. And petitioners perceive two such sets: (i) the SEC rulemaking delegation in Section 14(e)'s second sentence; and (ii) the express

---

[26] Although *Touche Ross & Co.* v. *Redington*, 442 U.S. 560 (1979), refused to imply a right of action under Section 17(a) of the Exchange Act, the case is easily distinguishable. A few examples: That provision was part of the original 1934 Act, not a subsequent amendment; Congress did not frame the provision using a verbatim formulation known to create a private action; Congress did not enact the provision immediately after *Borak* declared a parallel provision (using nearly parallel language) privately enforceable; and Congress did not aim to "harmonize" Section 17(a) with other companion private remedies. In short, it shares none of the unique factors driving the analysis here.

45

causes of action found elsewhere throughout the Acts. This is twice wrong.

As for Section 14(e)'s delegation to the SEC: This is a *rulemaking* delegation to enable the SEC to better define and proscribe certain "fraudulent, deceptive, or manipulative" devices. 15 U.S.C. 78n(e). Once the SEC promulgates its rules, those rules are then *enforced* via the Acts' remedies, which, of course, include Section 14(e)'s longstanding private right of action. Petitioners have simply misunderstood the point of this provision.

As for the Acts' express causes of action: Congress enacted the Williams Act against a backdrop where implied rights *were* recognized despite the existence of express remedies. So the Congress that enacted Section 14(e) obviously did not expect the existence of *some* express actions to foreclose an implied action under the new provision—just as the same express actions failed to foreclose implied actions under Rule 10b-5 or Section 14(a). *Herman & MacLean*, 459 U.S. at 380; *id.* at 383 (explaining that the securities laws tolerate "overlap" between remedies, and "Congress rejected the notion that the express remedies * * * would preempt all other rights of action").

c. The government argues that even if the Court eliminates Section 14(e)'s longstanding right of action, shareholders *might* have recourse under other provisions. Br. 31. This is cold comfort. Congress provided rights under Section 14(e) to protect the *precise* interests from the *precise* harm in the tender-offer setting. If it felt investors were adequately protected by other laws, it would have had no reason to enact Section 14(e) in the first place.

And a quick walk through the government's proposal highlights its flaws. The government's "solution" involves navigating "preempt[ion]" under the Williams Act, "preclu[sion]" under SLUSA, leaving some conduct unprotected, and trying to mix-and-match non-Section 14(e)

46

statutes to accommodate a *Section 14(e)* violation. Br. 31-32 & n.4. This takes a clear, administrable scheme and replaces it with a patchwork of coverage—requiring courts to waste time figuring out what other provisions (besides Section 14(e)) might apply to Section 14(e) violations.

The better answer is the one that has functioned effectively for the past 50 years: When a party is prejudiced by a violation of Section 14(e), a party seeks redress under Section 14(e). That plainly reflects Congress's intent when it enacted the statute, and there is no basis for the judiciary to countermand that determination more than half a century down the line.

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

JUAN E. MONTEVERDE
MILES D. SCHREINER
MONTEVERDE & ASSOCIATES PC
The Empire State Building
350 Fifth Ave., Ste. 4405
New York, NY 10118

BENJAMIN HEIKALI
FARUQI & FARUQI LLP
10866 Wilshire Blvd., Ste. 1470
Los Angeles, CA 90024

DANIEL L. GEYSER
   *Counsel of Record*
GEYSER P.C.
One Energy Square
4925 Greenville Ave., Ste. 200
Dallas, TX 75206
(214) 800-2660
*daniel.geyser@geyserpc.com*

MARCH 2019